**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

MASON F.,

       *Plaintiff,*

v.

COMMISSIONER OF SOCIAL
SECURITY,

       *Defendant.*

_____/

Case No. 1:25-cv-13485

Patricia T. Morris
United States Magistrate Judge

**MEMORANDUM OPINION AND ORDER ON**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 14, 16)**

## I.    CONCLUSION

For the reasons set forth below, Plaintiff's motion for summary judgment (ECF No. 14) is **DENIED**, the Commissioner of Social Security's motion for summary judgment (ECF No. 16) is **GRANTED**, and the decision of the administrative law judge (ALJ) is **AFFIRMED**.

## II.    ANALYSIS

### A.    Introduction and Procedural History

On April 1, 2023, Plaintiff filed an application for supplemental security

income, alleging disability beginning on June 1, 2008.[1]  (ECF No. 7-1, PageID.40).  The Commissioner initially denied the application on July 27, 2023, and on reconsideration on November 14, 2023.  (*Id.*).  Plaintiff then requested a hearing before an ALJ, which was held on July 16, 2024.  (*Id.*).  The ALJ issued a written decision on July 30, 2024, finding Plaintiff was not disabled.  (*Id.* at PageID.40–50).  Following the ALJ's decision, Plaintiff requested review from the Appeals Council, which denied the request on September 5, 2025.  (*Id.* at PageID.24–26).

Following the Appeals Council's denial of review, Plaintiff sought judicial review on October 31, 2025.  (ECF No. 1).  The parties consented to the Undersigned "conducting any or all proceedings in this case, including entry of a final judgment and all post-judgment matters."  (ECF No. 8).  The parties have since filed cross-motions for summary judgment for which briefing is complete.  (ECF Nos. 14, 16, 17).

**B.      Standard of Review**

District courts have jurisdiction to review the Commissioner's final administrative decisions pursuant to 42 U.S.C. § 405(g).  The review is restricted solely to determining whether "the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in

---

[1] Plaintiff later amended the alleged onset date to March 9, 2023, when he turned 18, making his claim solely for adult supplemental security income. (ECF No. 7-1, PageID.40, 237).

the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (citation modified). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citation modified). "[T]he threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation modified).

A district court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). Courts will "not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). "If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* (citation modified).

### C.   Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability "to engage in any substantial gainful activity by reason of any medically determinable

3

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

(i) At the first step, [the ALJ] consider[s] [the claimant's] work activity, if any. If [the claimant is] doing substantial gainful activity, [the ALJ] will find that [the claimant is] not disabled.

(ii) At the second step, [the ALJ] consider[s] the medical severity of [the claimant's] impairment(s). If [the claimant] do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, [the ALJ] will find that [the claimant is] not disabled.

(iii) At the third step, [the ALJ] also consider[s] the medical severity of [the claimant's] impairment(s). If [the claimant has] an impairment(s) that meets or equals one of [the] listings in appendix 1 of this subpart and meets the duration requirement, [the ALJ] will find that [the claimant is] disabled.

(iv) At the fourth step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . past relevant work. If [the claimant] can still do . . . past relevant work, [the ALJ] will find that [the claimant is] not disabled.

(v) At the fifth and last step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . age, education, and work experience to see if [the claimant] can make an adjustment to other work. If [the claimant] can make an adjustment to other work, [the ALJ] will find that [the claimant is] not disabled. If [the claimant] cannot make an adjustment to other work, [the ALJ] will find that [the claimant is] disabled.

20 C.F.R. § 404.1520(4); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing his or her residual functional capacity (RFC), which "is the most [the claimant] can still do despite [his or her] limitations," and is assessed using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 214 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ determined Plaintiff was not disabled. (ECF No. 7-1, PageID.50). At step one, the ALJ found Plaintiff had

not engaged in substantial gainful activity since April 1, 2023, the application date. (*Id.* at PageID.42).  At step two, the ALJ found the following severe impairments: autism spectrum disorder; attention deficit hyperactivity disorder (ADHD); and generalized anxiety disorder.  (*Id.*).

At step three, the ALJ found none of the impairments, either independently or in combination, met or medically equaled in severity or duration the criteria of any listing.  (*Id.* at PageID.42–45).  Next, the ALJ found Plaintiff had the RFC

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: can understand, remember, and carry out simple instructions and perform tasks that do not involve a specific production rate, such as assembly line work or hourly production quota, and would thus be unable to learn tasks that required instructions beyond a short demonstration up to and including 1 month to learn, and would be limited to applying commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form and deal with problems involving several concrete variables in or from standardized situations; can make simple work-related decisions; is able to tolerate occasional changes in the routine work setting; and, in addition to normal breaks, would be off task 15% of the time in an 8-hour workday.

(*Id.* at PageID.45).

At step four, the ALJ found Plaintiff had no past relevant work.  (*Id.* at PageID.48).  However, at step five, the ALJ found other jobs in the national economy Plaintiff could perform. (*Id.* at PageID.48–49).  Specifically, the ALJ found Plaintiff could perform the requirements of a kitchen helper (275,000 jobs in the national economy), a counter supply worker (113,000), and a housekeeping cleaner

(134,000). (*Id.* at PageID.49).  The ALJ thus concluded Plaintiff was "not disabled." (*Id.* at PageID.50).

### E.    Administrative Record

Plaintiff raises two issues on appeal.  First, he argues the ALJ's RFC analysis was deficient for failing to include a limitation on interactions with others.  Second, he argues the ALJ erred by failing to properly evaluate a medical opinion.  While the Court has reviewed the entire record, it will only summarize the evidence relevant to Plaintiff's issues on appeal.

Plaintiff has been diagnosed and treated for autism spectrum disorder, ADHD, and generalized anxiety disorder.  (ECF No. 7-1, PageID.46, 780).  Plaintiff was under an individualized education program (IEP) during high school and generally performed well, with mostly A's and B's, including in Advanced Placement (AP) World History, and a final GPA of 3.3.  (*Id.* at PageID.66, 251, 277, 305).  His IEP sometimes gave him extra time to take tests in a quiet space along with other accommodations.  (*Id.* at PageID.78–79).  He also participated in Eagle Scouts, earning more than 25 merit badges, and played on the school's varsity basketball and track teams.  (*Id.* at PageID.73, 75, 251, 780).  He had a large friend group in school and was active on social media.  (*Id.* at PageID.73–74, 783).  He did not have any disciplinary problems.  (*Id.* at PageID.76).

While attending and after graduating high school in 2023, Plaintiff

participated in outpatient mental health treatment with nurse practitioner Anne West. Plaintiff was prescribed Zoloft and Ritalin, which he took fairly consistently and denied any side effects from. (*Id.* at PageID.780, 972). He reported feeling more cheerful when on his medications and reported an acceptable level of anxiety of 6–7 days each month. (*Id.*). He generally appeared pleasant and cooperative, with normal speech, a euthymic mood, full range and appropriate affect, with intact orientation, attention, concentration, and memory. (*E.g., id.* at PageID.784, 790–91, 797, 805–06, 909–10, 923, 964, 970, 1002).

In July 2023, Plaintiff's mom reported he had been a bit more irritable over the last few months. (*Id.* at PageID.786). However, he had passed his driver's test and thought his work training program stocking shelves had been going well. (*Id.*). He went on a wilderness trip with the Eagle Scouts later in July. (*Id.*). In August, Plaintiff's mom attributed his recent irritability to increased stress secondary to increasing responsibilities—*i.e.*, graduating high school and "becoming an adult." (*Id.* at PageID.793). He was engaged with several programs to help him find work. (*Id.*).

In September, his mom reported a few "blow-up episodes," which included yelling, throwing things, and breaking things. (*Id.* at PageID.801). His mom also reported personal growth which included driving more, cooking, and doing laundry. (*Id.*). West noted he would start seeing a therapist soon. (*Id.*). Based on these

ongoing symptoms, Plaintiff was continued on Zoloft and Ritalin and additionally prescribed Lamotrigine (a mood stabilizer).[2]  (*Id.* at PageID.806).  Plaintiff also reported applying for numerous jobs and being anxious to get hired.  (*Id.*).

In October 2023, Plaintiff's mood was still up and down, with irritability and some blow ups.  (*Id.* at PageID.998).  He reported he would soon be starting a job at Marshall's.  (*Id.*).  In December 2023 and January 2024, Plaintiff felt that his current medication regime was working well for him and reported no issues except some anxiety.  (*Id.* at PageID.1010, 1015, 1019).  In March 2024, Plaintiff reported doing relatively well with some instances of getting angry or irritated.  (*Id.* at PageID.1022).  He reported the next month was ok, with some stress and anxiety. (*Id.* at PageID.1028, 1032–33).

In October 2023, West completed a mental medical source statement.  (*Id.* at PageID.822–28).  She noted Plaintiff had responded positively to medications overall but that they were still adjusting them as necessary.[3]  (*Id.* at PageID.822). She opined Plaintiff would likely be off task about 15% of a typical workday due to his symptoms.  (*Id.* at PageID.823).  Next, she opined Plaintiff was limited or

---

[2] Throughout treatment, Plaintiff's psychiatrist adjusted Plaintiff's medication dosages several times to get the best results for him.

[3] Indeed, Plaintiff's outbursts and mood seemed much worse in the year before the period of alleged disability as Plaintiff's medication was being optimized.  (*See generally* ECF No. 7-1, PageID.905–51).

seriously limited but not precluded in several abilities and aptitudes needed to do unskilled work. (*Id.* at PageID.824). However, she checked that Plaintiff would be unable to meet competitive standards in the following three areas of functioning: making simple work-related decisions; dealing with normal work stress; and being aware of normal hazards and taking appropriate precautions. (*Id.*). West opined Plaintiff was not limited in interacting with others and satisfactory at maintaining socially appropriate behavior, but contradictorily that he would have a moderate limitation in interacting with others. (*Id.* at PageID.825, 827).

Plaintiff testified that he planned to go to a trade school in October 2024. (*Id.* at PageID.64). He was currently working 13–15 hours a week at Marshall's doing cleaning work and learning how to stock and process sale items. (*Id.* at PageID.66–67). Plaintiff said he would take a full-time position if it was offered to him but he worried about other impacts on his schedule. (*Id.* at PageID.67–68). Plaintiff felt that his other obligations, such as occupational therapy, psychology appointments, and preparing for trade school in the fall prevented him from working full time. (*Id.* at PageID.68–69). When the ALJ clarified the question, Plaintiff testified that nothing about his disability is holding him back from holding a full-time job. (*Id.* at PageID.69–70).

Plaintiff continued to see his friends from school twice a week. (*Id.* at PageID.73). His current hobbies included seeing friends, working out, watching

10

sports, hiking, and reading.  (*Id.* at PageID.77).  Plaintiff also testified that it is sometimes hard to get back to work when someone distracts him.  (*Id.* at PageID.82). He sometimes got anxious around strangers but he was able to answer simple questions from customers at Marshall's or direct them to someone who would know the answer.  (*Id.* at PageID.83).  Plaintiff's mother also testified at the hearing and clarified that Plaintiff was able to complete chores but that she had to write them down for him or they may be skipped.  (*Id.* at PageID.85).  Other evidence will be discussed below as necessary.

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision.  42 U.S.C. § 423(d)(5)(B).  The regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources, and nonmedical sources.  An acceptable medical source means a medical source who is a:

(1) Licensed physician (medical or osteopathic doctor);

(2) Licensed psychologist, which includes:

    (i)    A licensed or certified psychologist at the independent practice level; or

    (ii)    A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for

> impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;
>
> (3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;
>
> (4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;
>
> (5) Qualified speech-language pathologist for speech or language impairments only.  For this source, *qualified* means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language Pathology from the American Speech-Language-Hearing Association;
>
> (6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only . . . ;
>
> (7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice . . . ; or
>
> (8) Licensed Physician Assistant for impairments within his or her licensed scope of practice . . . .

20 C.F.R. § 404.1502(a) (2021).  A medical source is

> an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law.

*Id.* § 404.1502(d).  In contrast, a nonmedical source is "a source of evidence who is

not a medical source." *Id.* § 404.1502(e).   "This includes, but is not limited to: (1) [the claimant];  (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The Social Security Administration (SSA) "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." *Id.* § 404.1520c(a).   "The most important factors [the SSA] consider[s] when evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.*   The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case.  *Id.* § 404.1520c(c).

The first factor is "supportability."   For this factor, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the opinion.   In essence,

13

"[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the source's "[r]elationship with the claimant." *Id*. § 404.1520c(c)(3).  This factor includes analysis of:

(i)  Length of the treatment relationship.  The length of time a medical source has treated [the claimant] may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);

(ii)  Frequency of examinations.  The frequency of [the claimant's] visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);

(iii)  Purpose of the treatment relationship.  The purpose for treatment [the claimant] received from the medical source may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);

(iv)  Extent of the treatment relationship.  The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);

(v)  Examining relationship.  A medical source may have a better understanding of [the claimant's] impairment(s) if he or she examines [the claimant] than if the medical source only reviews evidence in [the claimant's] folder.

*Id.*

The fourth factor of the SSA's analysis is "specialization."  In making this determination, the SSA will consider

> [t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

*Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors."  These may include any other information that "tend[s] to support or contradict a medical opinion or prior administrative medical finding."  *Id.* § 404.1520c(c)(5).  Other factors include "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements."  *Id.*  Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, [it] will also consider whether new evidence [it] receive[s] after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive."  *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements."  The ALJ will consider "source-level articulation."  Pursuant to this requirement,

15

> [b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate.

*Id.* § 404.1520c(b)(1). The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors [the SSA] consider[s] when [it] determine[s] how persuasive [it] find[s] a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2). As such, the SSA

> will explain how [it] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [the claimant's] determination or decision. [The SSA] may, but [is] not required to, explain how [it] considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when [it] articulate[s] how [it] consider[s] medical opinions and prior administrative medical findings in [the claimant's] case record.

*Id.*

When medical opinions or prior administrative findings are "equally

16

persuasive," "well-supported," and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors . . . for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3). The regulations clarify that the SSA is "not required to articulate how [it] considered evidence from nonmedical sources using the requirements of paragraphs (a)–(c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how [it] considered such evidence in [its] determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities"; "[d]isability examiner findings," meaning "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate determination about whether [the claimant is] disabled"; and "[s]tatements on issues reserved to the Commissioner[,]" including

(i)    Statements that [the claimant is] or [is] not disabled, blind, able to work, or able to perform regular or continuing work;

(ii)    Statements about whether or not [the claimant has] a severe impairment(s);

17

(iii) Statements about whether or not [the claimant's] impairment(s) meet the duration requirement . . . ;

(iv) Statements about whether or not [the claimant's] impairment(s) meets or medically equals any listing in the Listing of Impairments . . . ;

(v) Statements about what [the claimant's] residual functional capacity is using [the SSA's] programmatic terms about the functional exertional levels . . . instead of descriptions about [the claimant's] functional abilities and limitations . . . ;

(vi) Statements about whether or not [the claimant's] residual functional capacity prevents [the claimant] from doing past relevant work . . . ;

(vii) Statements that [the claimant] [does] or [does] not meet the requirements of a medical-vocational rule . . . ; and

(viii) Statements about whether or not [the claimant's] disability continues or ends when [the SSA] conduct[s] a continuing disability review.

*Id.* § 404.1520b(c)(3).

The regulations also provide that

[b]ecause a decision by any other governmental agency or a nongovernmental entity about whether [a claimant is] disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on [the SSA] and is not [its] decision about whether [the claimant is] disabled or blind under [SSA] rules.

*Id.* § 404.1504. Therefore, the SSA "will not provide any analysis in [its] determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether [the claimant is] disabled, blind, employable, or entitled to any benefits." *Id.* The SSA will, however, "consider all

18

of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that [it] receive[s] as evidence in [a] claim . . . ." *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f).  Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from [the claimant's] statements (symptoms)." *Id.* § 404.1502(g).  Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.*  Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques," which "include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain:

19

> In determining whether [the claimant is] disabled, [the SSA will] consider all [the claimant's] symptoms, including pain, and the extent to which [the] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  [The SSA] will consider all [the claimant's] statements about [his or her] symptoms, such as pain, and any description [the claimant's] medical sources or nonmedical sources may provide about how the symptoms affect [the claimant's] activities of daily living and [his or her] ability to work.

*Id.* § 404.1529(a).  But the SSA clarified that

> statements about [the claimant's] pain or other symptoms will not alone establish that [the claimant is] disabled.  There must be objective medical evidence from an acceptable medical source that shows [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence of [the claimant's] pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that [the claimant is] disabled.

*Id.*   Further, "[i]n evaluating the intensity and persistence of [the claimant's] symptoms, including pain, [the SSA] will consider all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how [the claimant's] symptoms affect [him or her]."  *Id.*  The SSA will "then determine the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how [the claimant's] symptoms affect [his or her] ability to work."  *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, [it] will carefully consider any other information [the claimant] may submit about [his or her] symptoms." *Id.* § 404.1529(c)(3). This other information may include "[t]he information that [the claimant's] medical sources or nonmedical sources provide about [the claimant's] pain or other symptoms," such as "what may precipitate or aggravate [the claimant's] symptoms, what medications, treatments or other methods [the claimant uses] to alleviate them, and how the symptoms may affect [the claimant's] pattern of daily living," which "is also an important indicator of the intensity and persistence of [the claimant's] symptoms." *Id.*

> Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that [the claimant's] medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . [The SSA] will consider all of the evidence presented, including information about [the claimant's] prior work record, [the claimant's] statements about [his or her] symptoms, evidence submitted by [the claimant's] medical sources, and observations by [the SSA's] employees and other persons.

*Id.* Factors relevant to a claimant's symptoms, such as pain, include:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain or other symptoms;

(iii)   Precipitating and aggravating factors;

(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)   Treatment, other than medication, . . . received for relief of . . . pain or other symptoms;

(vi)   Any measures . . . used to relieve . . . pain or other symptoms.

*Id.*

The new regulations also impose a duty on the claimant: "[i]n order to get benefits, [the claimant] must follow treatment prescribed by [his or her] medical source(s) if this treatment is expected to restore [his or her] ability to work." *Id.* § 404.1530(a).   Stated differently, "[i]f [the claimant does] not follow the prescribed treatment without a good reason, [the SSA] will not find [the claimant] disabled or, if [the claimant is] already receiving benefits, [the SSA] will stop paying . . . benefits." *Id.* § 404.1530(b).   Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)   The specific medical treatment is contrary to the established teaching and tenets of [the claimant's] religion;

(2)   The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)   Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)   The treatment because of its magnitude (e.g., open heart surgery), unusual nature (e.g., organ transplant), or other reason

22

> is very risky for [the claimant]; or

> (5)    The treatment involves amputation of an extremity, or a major part of an extremity.

*Id.* § 404.1530(c).

### G.    Argument and Analysis

As stated above, Plaintiff first argues the ALJ's RFC analysis was deficient for failing to include a limitation on interactions with others. Second, he argues the ALJ erred by failing to properly evaluate a medical opinion.

#### 1.    Interaction with Others

Plaintiff argues the ALJ was required to include a social interaction limitation in the RFC. (ECF No. 14, PageID.1513). Specifically, Plaintiff argues the ALJ "acknowledged that Plaintiff had 'persistent deficits in social communication and social interactions' and 'occasional complaints of irritability.'" (*Id.*).

But the ALJ did not find Plaintiff had persistent deficits in social communication and interactions as Plaintiff contends. Plaintiff's partial quote is misleading.[4] The ALJ actually said, "According to a psychological evaluation from

---

[4] This Court has previously cautioned Plaintiff's attorney, Erin Rich, about playing fast and loose with the law and facts. *See Brent H. v. Comm'r of Soc. Sec.*, No. 25-cv-12606, 2026 WL 984232, at \*13 n.4 (E.D. Mich. April 13, 2026). The Court now notes that Plaintiff's opening brief was submitted prior to this warning. Although Plaintiff's reply brief argues the issue is not whether the ALJ used a particular phrase as a formal finding but whether he adequately accounted for the evidence (ECF No. 17, PageID.1541), the Court strongly reminds counsel that she has an independent duty to verify that her "factual

March 2022, *the claimant endorsed* a history of persistent deficits in social communication and social interactions."   (ECF No. 7-1, PageID.43 (emphasis added)).   But this was not the entirety of the ALJ's findings on Plaintiff's mental limitations in interacting with others.   Indeed, the ALJ reached a conclusion opposite to that stated:

> In interacting with others, the claimant has a mild limitation. Educational records reflect that the claimant is sometimes impulsive with respect to social interactions in that he does not often wait his turn to speak or raise his hand to be called on.  His teacher identified only slight problems in the claimant's abilities to make and keep friends, seek attention appropriately, express anger appropriately, and interpret facial expressions, body language, hints, and sarcasm.  Otherwise, she indicated that the claimant had no problems in interacting and related to others.  According to a psychological evaluation from March 2022, the claimant endorsed a history of persistent deficits in social communication and social interactions.  Treatment records also reflect occasional complaints of irritability, though there is no evidence of aggressive or otherwise inappropriate reactive or antagonistic behavior. Despite some irritability, treatment records show that he repeatedly presented with pleasant and cooperative demeanor and normal speech. Moreover, medical records indicate that the claimant had a large friend group in school and is able to participate in Eagle Scouts.  He also testified that he sees his friends about twice per week and is active on social media.  Taken as a whole, the evidence does not demonstrate that the claimant has more than mild limitations in interacting with others.

(*Id.* (internal record citations omitted)).   The ALJ repeated this evidence in crafting Plaintiff's RFC and specifically incorporated his paragraph B finding in interacting with others into the RFC analysis.  (*Id.* at PageID.46–47).   There is no basis for

---

contentions have evidentiary support."  Fed. R. Civ. P. 11(b)(3).   Whatever the issue, Plaintiff's brief makes a false assertion of fact as to what the ALJ found.

Plaintiff's argument that the ALJ was required to add limitations on social interactions to his RFC. *See Plotkowski v. Comm'r of Soc. Sec.*, No. 20-cv-12011, 2022 WL 413371, at *6 (E.D. Mich. Jan. 18, 2022) ("[W]hile the regulations require the ALJ to 'consider' the possible effect of a non-severe impairment on the claimant's capacity for work, there is no accompanying requirement that the RFC must include restrictions reflecting a non-severe condition in the RFC."), *report and recommendation adopted sub nom.*, *Plotkowski v. Saul*, 2022 WL 407079 (E.D. Mich. Feb. 9, 2022).

Plaintiff next argues that the record supports social-functioning limitations. (ECF No. 14, PageID.1514). But this is nothing more than a thinly veiled attempt to get the Court to reweigh the evidence, which it may not do. *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994); *Nasser v. Comm'r of Soc. Sec.*, No. 22-1293, 2022 WL 17348838, at *2 (6th Cir. 2022) (holding plaintiff's arguments regarding the supportability and consistency factors were "veiled attempts" to circumvent the substantial evidence standard and are "classic examples of invitations to reweigh the evidence and to find other medical opinions more persuasive"). Ultimately, the ALJ's decision is supported by substantial evidence and Plaintiff has not shown error in failing to include any social interaction

limitations.[5]

## 2.    Opinion Evidence

Plaintiff next argues the ALJ erred when he failed to properly consider Nurse Practitioner Anne West's opinion.  (ECF No. 14, PageID.1515).  This argument is not persuasive.

As a refresher, the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a).  An ALJ must explain his or her approach with respect to supportability and consistency when considering a medical opinion.  *Id*. § 404.1520c(b).  For supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."

---

[5] Additionally, the Court notes the ALJ found jobs existing in significant numbers in the national economy Plaintiff could do that involved minimal to no interaction with others. *See Leverich v. Comm'r of Soc. Sec.*, No. 16-cv-163, 2017 WL 2805166, at *5 (W.D. Mich. June 29, 2017) ("On [its] face, the cleaner/housekeeper . . . occupation[] do[es] not obviously require interaction with the public."); *Pastorino v. Comm'r of Soc. Sec.*, No. 15-cv-10918, 2016 WL 11472338, at *5 (E.D. Mich. Jan. 31, 2016) (finding plaintiff could perform the work of a housekeeper and packager even with limitation on interacting with the general public and coworkers); *Dunn v. Saul*, No. 19-cv-13133, 2020 WL 7700614, at *10 (E.D. Mich. Nov. 30, 2020) (finding job of cleaner does not require significant interaction with supervisors), *report and recommendation adopted*, 2020 WL 7695900 (E.D. Mich. Dec. 28, 2020).

*Id.* § 404.1520c(c)(1).  For consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2). Importantly,

> The new regulation substantially reduces the ALJ's obligation to explain the basis for his or her assessment of medical opinions:

> > [Source-level articulation.]  Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record.  Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate.  We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

*Adams v. Comm'r of Soc. Sec.*, No. 23-3284, 2023 WL 6366106, at *2 (6th Cir. Sept. 28, 2023) (quoting 20 C.F.R. § 404.1520c(b)(1)); *see also Robinson v. Comm'r of Soc. Sec.*, No. 22-1397, 2022 WL 17168444, at *2 (6th Cir. 2022) ("Even for a medical opinion, there is no requirement to cite to every piece of evidence or conclusion.").

Plaintiff argues the ALJ's reasoning, block-quoted below, was inadequate to reject West's opined limitations that he was unable to make simple work-related decisions or deal with normal work stress. (ECF No. 14, PageID.1516). The ALJ found:

> The abilities and limitations [West] identified are supported by the explanations she provided and fairly consistent with the longitudinal evidence with three exceptions. First, NP West's opinion that the claimant is unable to make simple work-related decisions is inconsistent with the claimant's work experience in a job where he independently makes simple decisions. The fact that the claimant drives and has participated in Eagle Scouts also lends to the conclusion that he is capable of making simple decisions. Secondly, NP West's opinions regarding the claimant's ability to deal with normal work stress are not fully supported or consistent with the evidence. I note that the claimant has shown some irritability, but neither NP West's notes nor other compelling evidence demonstrate the level of irritability or other inability to cope with ordinary stress. Indeed, I note that the claimant testified that he enjoys his job, which tends to suggest that he can handle the stress associated with his work and other unskilled-type work. . . . Thus, her conclusions here are neither well supported nor consistent with the evidence.

(ECF No. 7-1, PageID.47 (internal record citations omitted)).

Plaintiff argues the ALJ's reliance on "limited daily activities" does not equate to the ability to perform full-time competitive employment. (ECF No. 14, PageID.1516 (citing *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248–49 (6th Cir. 2007); *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723–26 (6th Cir. 2014))). *Gentry* is inapposite. That case dealt with an ALJ who ignored significant evidence in discrediting the claimant's complaints of pain and restrictions. Plaintiff does not

28

argue the ALJ completely ignored large portions of the record in his decision.  While *Rogers* at least stands for a similar proposition as it is cited for, it is also inapposite. There, the Sixth Circuit discussed the ALJ's discrediting of the plaintiff's testimony as to her subjective complaints and limitations.  The plaintiff's "somewhat minimal daily functions" included very little driving, light housekeeping, opening the door for her dog, reading with difficulty holding a book, and eating cereal, and were thus not comparable to typical work activities.  *Rogers*, 486 F.3d at 248–49.

Here, unlike the cases Plaintiff cites, the ALJ was discounting specific limitations opined by West.  The ALJ was not wholly discounting Plaintiff's testimony based on minimal daily activities.  Instead, he focused on specific limitations and drew conclusions about each based on record evidence.  The ALJ first discussed West's opinion that Plaintiff was unable to make simple-work related decisions.  He found this opinion inconsistent with the fact that he has a part-time job where he actually does make simple work-related decisions.  In addition, the ALJ found Plaintiff's ability to drive and success in the Eagle Scouts also showed the capacity to make simple decisions.  This is specific, substantial evidence from the record that supports the ALJ's conclusion.  *Accord Dunlavy v. Comm'r of Soc. Sec.*, No. 24-3333, 2024 WL 4558606, at *3 (6th Cir. 2024) ("The ALJ accordingly found that Dunlavy does not need a solitary work setting because her regular activities show she can maintain concentration and interact with others, and that she

29

does not need a flexible attendance policy because she can perform activities on a 'regular and continuing basis.'").

Second, the ALJ discussed that Plaintiff's irritability was not shown at a level which would preclude handling normal work stress and that Plaintiff's success at, and enjoyment of, his current part-time job suggests he can handle typical work stress. Although the job is part-time and not full-time, it is nowhere near the basic activities discussed in *Rogers* and is instead substantial evidence to undermine West's conclusion that Plaintiff would be wholly unable to handle normal work stress. Plaintiff makes no argument why being able to handle normal work stress in an environment for 15 hours a week would be substantially different for him than handling the same normal work stresses for 40 hours a week. Instead, even Plaintiff testified there was nothing about his disability holding him back from full-time work and that it was only other commitments he has, including attending trade school, which prevent him from working full time. (ECF No. 7-1, PageID.69–70).

Plaintiff then makes another impermissible attempt to have the Court reweigh the evidence by arguing that the treatment record supports West's opined limitations. (ECF No. 14, PageID.1516–17). But again, the question is not whether substantial evidence could support West's limitations, but whether substantial evidence supports the ALJ's limitations. *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442 (6th Cir. 2017) ("[W]hen the ALJ is presented with the not uncommon situation

of conflicting medical evidence the trier of fact has the duty to resolve that conflict. Our job is only to ensure that the Commissioner's determination is supported by substantial evidence." (citation modified)).   Even if substantial evidence could support the limitations Plaintiff alleges are necessary, substantial evidence also supports the ALJ's determinations.   Therefore, Plaintiff's motion for summary judgment is denied.

## III.   ORDER

For these reasons, Plaintiff's motion (ECF No. 14) is **DENIED**, the Commissioner's motion (ECF No. 16) is **GRANTED**, and the ALJ's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

Date: May 26, 2026

S/PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge

31